OPINION OF THE COURT
David O. Boehm, J.
The defendant moves to suppress the results of a breath test on a number of grounds. The principal conten *345 tion raised is that the breathalyzer model used in this case (i.e., Smith and Wesson breathalyzer model 900A) is unreliable. This contention is based on the recent discovery that the instrument is susceptible to radio frequency interference. In addition, the defendant argues that the test results cannot be used in the prosecution for the Penal Law charges against him because his consent to submit to the breath test was not voluntary, and further, because he was not given Miranda warnings, advised that the test results could be used in a prosecution for violations of the Penal Law, nor permitted to obtain the advice of an attorney prior to the administration of the test.
At about 3:30 p.m. on April 21, 1982 the defendant was arrested for driving while intoxicated after the car in which he was driving struck two school children and a school crossing guard. The defendant was brought to the Irondequoit Police Department where he asked for an attorney. The defendant was permitted to use a telephone, but his attempts to contact an attorney were unsuccessful. After the defendant was read the warnings required under section 1194 of the Vehicle and Traffic Law, he agreed to submit-to a breath test. He was tested by means of a Smith and Wesson breathalyzer model 900A, and the test results showed a blood-alcohol content of .15%. Subsequently, the defendant was indicted for assault in the second and third degrees, operating a motor vehicle while under the influence of alcohol, failure to obey a traffic control device, and operating a motor vehicle in a no-passing zone.
The problem of radio frequency interference affecting breathalyzer model 900A was addressed by the manufacturer, Smith and Wesson, in a consumer advisory dated September 10, 1982. The susceptibility of breathalyzers to radio interference was initially brought to the attention of Smith and Wesson with regard to its model 1000, but subsequent testing of the earlier models (i.e., 900, 900A) indicated that they, too, “may be affected in an unpredictable manner by various frequencies and power levels.” In its advisory, Smith and Wesson further admitted that “the extent of sensitivity to particular frequencies and particular power levels will vary from instrument to instrument.”
*346 Smith and Wesson recommended that all of their models be tested to determine if radio interference might lead to inaccurate test results. Two tests were set forth in detail in the advisory: one to determine the effect of background radio frequency energy, such as commercial radio and television broadcasts; and, the other to determine the affect of a law enforcement agency’s own radio transmissions. On November 5, 1982, the Irondequoit Police Department conducted these tests on the same model 900A breathalyzer with which the defendant had been tested on April 21, 1982, when arrested. The results of those tests were all within the tolerances prescribed by the New York State Department of Health (see 10 NYCRR 59.5 [d]). The defendant argues, however, that the tests conducted by the Irondequoit Police Department over six months after he submitted to the breath test were, “not sufficiently connected in time, occurrence, conditions as to people, things and other sources of radio frequency interference, to be reliable enough to be admissible to demonstrate the freedom of the machine from radio frequency interference” at the date and time his test was taken.
In opposing this motion, the People draw this court’s attention to the tests conducted by the Irondequoit Police Department on the breathalyzer in question. The People point out that the instrument was located in the lock-up area of the Irondequoit Police Department when the defendant submitted to the breath test, that it has been in that location since that time, and that it was in that same location when the tests recommended by Smith and Wesson were conducted. Further, the People present evidence of similar tests conducted by other law enforcement agencies in Monroe County on their own 900A’s which likewise failed to disclose any deviation occasioned by radio interference. In addition, the People have submitted simulator solution test logs for the breathalyzer used in this case, which cover 300 such tests conducted between November 26, 1981 and February 28, 1983. In all but three of those 300 tests the instrument measured within the .01% tolerance prescribed by the Department of Health. In the three instances where the reading exceeded the allowable tolerance, the test result was .08% instead of the standard .10% *347 of the simulator solution. The People attribute these failures to deterioration of the simulator solution.
In People v Donaldson (36 AD2d 37), it was held that expert testimony as to the nature, function or scientific principles underlying a breathalyzer need not be presented as a necessary foundation for the admissibility of breathalyzer test results. After noting the long usage (since 1954) and wide acceptance of the instrument as a device for testing blood-alcohol content, the court held that the time had come to recognize the general reliability of the breathalyzer (supra, pp 39-40; see, also, People v Morris, 63 Misc 2d 124). In so holding, the court observed that, “[sjtudies have shown that this device is considered to be ‘fail safe’ and that as a general rule its readings are slightly lower than those obtained in a corresponding blood test; and any slight error caused either by mechanical defect or operator fault will usually produce lower rather than higher readings” (36 AD2d, at p 40). Accordingly, the court ruled that the test results in that case were properly admitted in evidence where (1) the person administering the test was properly qualified; (2) the instrument was properly calibrated; (3) the chemicals used in the test were of the proper kind and mixed in the proper proportions; and (4) the test was properly conducted (36 AD2d, at pp 40-41; see, also, Roy v Reid, 38 AD2d 717; People v Meikrantz, 77 Misc 2d 892, 898-899).
More recently, in People v Gower (42 NY2d 117), a case dealing with the admissibility of various certificates offered by the prosecution to prove that a breathalyzer device was in proper working order and the ampoules used contained properly compounded chemicals, the Court of Appeals observed that the reliability of breathalyzer equipment “has been demonstrated and the results of such testing where properly performed are universally accepted” (42 NY2d, at p 121). After noting the appropriateness of some relaxation of the “rigorous prerequisites” required to authenticate the reliability of such scientific equipment and procedures where they are first employed, the court concluded, “[t]hus, emphasis may be shifted from technical issues of admissibility of evidence to means for measuring its persuasive weight” (42 NY2d, at pp 121-122; *348 see, also, Watts, Some Observations on Police-Administered Tests for Intoxication, 45 NCL Rev 34, 86 [which notes that possible errors as to the strength and identity of reagents used in the test are primarily considered to affect the weight of the test results as evidence, but not its admissibility]).
In addition, the Legislature has provided that the results of breath tests are admissible into evidence (Vehicle and Traffic Law, § 1195). By so doing, it also recognized the general reliability of such tests when properly conducted (see Roy v Reid, supra; People v Donaldson, supra, p 40). It is common knowledge that about one half of the States have enacted similar recognition.[1]
The issue before the court does not call into question the continuing vitality of the authority cited above. Rather, the single issue presented is whether, because of the recent discovery that radio frequency interference may affect the accuracy of a particular model of breath testing instrument, such instrument is thereby rendered unreliable.
As a general rule, before the results of a scientific instrument or procedure may be used as evidence, it must be established that the instrument or procedure has gained general acceptance in the scientific community (see People v Leone, 25 NY2d 511, 517; People v Hughes, 88 AD 2d 17, 19-20; see, also, People v Middleton, 54 NY2d 42, 49-50; see, generally, Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Col L Rev 1197). It has also been suggested that, in addition to a showing of general scientific acceptance, the reliability of the instrument or procedure must be demonstrated (People v Collins, 94 Misc 2d 704, 707; see, also, People v Leone, supra, p 518).
The case at bar does not involve the admissibility of a previously unaccepted scientific instrument or procedure (e.g., People v Leone, supra [polygraph]; People v Hughes, supra [hypnosis];. People v Collins, supra [spectrograph]) nor does it involve a new use of a previously accepted scientific principle (e.g., People v Friend, 117 Mise 2d 392; People v Bellizzi, 108 Misc 2d 209 [the use of radar to *349 measure the speed of an on-coming vehicle while the instrument is located in another vehicle traveling in the opposite direction]).
However, since the case does involve the reliability of a scientific instrument, the foregoing principles are applicable in the evaluation of the continuing reliability of model 900Á. After reviewing the motion papers, including the exhibits and appendix, the court is not persuaded that model 900A is unreliable. It is not disputed that model 900A is sensitive to radio interference. Smith and Wesson acknowledged that fact after conducting a series of tests. In those tests radio equipment capable of transmitting at four different frequencies and power levels was installed in a vehicle. A number of breathalyzers were placed on a table which was located in a vacant parking lot, and the vehicle was moved away from the table to determine the maximum distance at which a particular frequency/power level combination caused any deflection of the nullmeter. Although the test results indicate that under certain conditions a radio transmission 150 feet away may cause the nullmeter needle to deflect, the relationship between the nullmeter and the ultimate test reading has not been adequately addressed.
In an affidavit, Michael Polozie states that Herb Belin, the chief of Smith and Wesson’s research and testing department, indicated that radio interference may increase a test reading by 100%. However, in a proceeding before a State District Court in Minnesota (transcript submitted as an exhibit), at which the issue of radio frequency interference was explored in depth, the testimony of the same Herb Belin suggested that although radio interference may affect the nullmeter, the effect upon the test result would be minimal. Indeed, in its findings, the Minnesota court stated, “[i]f deflection of the balancing device is extreme enough, it could result in a deflection of the alcohol concentration reading” (emphasis added). Furthermore, a letter from Dr. Kurt Dubowski also supports the view that the affect of radio interference upon the test result is minimal. Thus, the proof submitted is insufficient for a finding that radio interference sufficiently affects the test results of breathalyzer model 900A as to be in excess of *350 allowable tolerances prescribed by the Department of Health (10 NYCRR 59.4 [a] [3]).
Furthermore, even assuming that the “worst-case” of radio interference could cause a deviation in test results in excess of allowable tolerances, it has not been shown that such a frequency/power level combination could cause an equally aberrant result when the instrument is used in a typical test setting. Smith and Wesson was attempting to create a “worst-case” scenario by testing the instruments in an open parking lot, thereby eliminating intervening structures which might lessen the effect of the interference. Thus, while the tests conducted by Smith and Wesson caused some deflection of the nullmeter in the circumstances in which they were performed, the same may not have occurred had the instrument been tested in a more typical setting. The record of 300 simulator solutions tests conducted on the instrument used in this case, in which there were only three failures (and these the People attribute to deterioration of the simulator solution) is persuasive proof of the reliability of that instrument, at least when operated in its normal environment.
Clearly, the proof thus far submitted fails to require a determination that radio interference had a significant effect upon the accuracy of the blood-alcohol reading here, and that the likelihood of such an effect exists in a typical test setting. Accordingly, there appears to be no reasonable basis for finding model 900A generally unreliable simply because it is acknowledged to be sensitive to radio interference.
However, although the proof presented is, of itself, insufficient to warrant a finding of the unreliability of model 900A, at the very least, it raises a question deserving further examination as to the effect of radio interference upon it. In its consumer advisory Smith and Wesson warns that model 900A may be affected by radio interference in an unpredictable manner, and that sensitivity to radio interference will vary from instrument to instrument. Although Smith and Wesson has recommended procedures to test for radio interference, nevertheless, as the defendant points out, those tests appear to be inadequate to discover the effect of isolated or sporadic radio signals which were *351 not present when the tests were conducted. Thus the fact that the particular unit in this case may not have displayed any deviation when subjected to the test procedures suggested by Smith and Wesson does not of itself ensure the consistent reliability of the instrument.
In so holding, this court rejects the People’s contention that the issue of radio interference should be reserved for trial. The alleged infirmity of the breath test at issue in this case is not analogous to a situation in which a particular test may not have been properly conducted due to some procedural defect (see People v Donaldson, 36 AD2d 37, supra; People v Meikrantz, 77 Misc 2d 892, supra). In the latter case it is appropriate to deal with such inadequacies at trial because the alleged defect can only affect that case. In this case, however, because the ability of a particular model of breath testing device to render accurate test results has been called into question by its own manufacturer, a similar question is raised as to its test results. Thus, to hold a hearing which would explore the practical effect of radio interference on the accuracy of model 900A would be an efficient way to resolve the issue and thereafter ensure some uniformity among lower courts which confront this issue on a daily basis.
The defendant contends that the People would have the burden at such a hearing of establishing that radio interference does not affect the test results. The court does not agree. Although the burden is upon the People to establish initially that a breath test was properly conducted in order for the results of such test to be admissible (see People v Todd, 38 NY2d 755; Miller v Farina, 58 AD2d 731; People v Meikrantz, supra, pp 898-899), here the issue is whether radio interference so impairs the accuracy of breathalyzer model 900A as to render that instrument generally unreliable.
As previously noted, the general reliability of breathalyzers was first recognized by the appellate courts of this State over 10 years ago. This “presumption” of reliability should not be comprised absent reliable proof that model 900A can and does render erroneous test results under conditions which may occur when it is used by police in the field. If the defendant in this proceeding had been success- *352 fill in showing that radio interference could cause model 900A to exceed allowable tolerances, the reliability of the instrument would have been called into question and the burden would then have been thrust upon the People to show that such interference did not or could not impair the test results in this case. However, because the defendant has shown little more than that model 900A is sensitive to radio interference, he should bear the initial burden of proving that such sensitivity can and does cause test results in excess of allowable tolerances.
The defendant also contends that the results of the breath test should be suppressed in the prosecution of the penal charges against him on the grounds previously stated.
In People v Moselle (57 NY2d 97) the Court of Appeals held, in part, that blood samples taken without a defendant’s consent are inadmissible in prosecutions under the Penal Law unless taken pursuant to a court order. In so holding, the court stated (p 108) that section 1194 of the Vehicle and Traffic Law, “only authorizes the giving of chemical blood tests for prosecutions for violations of the Vehicle and Traffic Law * * * [and] has no application to charges brought under sections of the Penal Law, notwithstanding that the charged Penal Law violations arise out of the operation of a motor vehicle”.
Relying upon the above language, the defendant contends that the results of his breath test are inadmissible as to the Penal Law charges against him, because he submitted to the breath test under the compulsion of the consequences of refusing to submit, i.e., the suspension of his license to drive, and the admission into evidence of his refusal to take the test in a Vehicle and Traffic Law prosecution arising out of the incident.
In support of his position, the defendant cites cases dealing with consent as an exception to the search warrant requirement. Generally, in such cases, when the prosecution seeks to rely upon consent to justify the lawfulness of a search, it has a heavy burden of proving the voluntariness of the consent (see Bumper v North Carolina, 391 US 543, 548-549; People v Whitehurst, 25 NY2d 389, 391; People v McNeeley, 77 AD2d 205, 209).
*353 Such burden has been strictly construed. “Consent to search is voluntary when it it a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle” (People v Gonzalez, 39 NY2d 122,128). Submission to authority does not constitute voluntary consent (People v Gorsline, 47 AD2d 273, 276).
The essential purpose of this section 1194 warning is to obtain the consent of a motorist, suspected of drunken driving, to submit to a blood-alcohol test (People v Thomas, 46 NY2d 100, 108). Such consent is not deemed to be voluntary, as that term is used in consent to search cases. However, it is well established that even a compelled chemical test to determine blood-alcohol content does not violate the constitutional rights of a motor vehicle operator (see Schmerber v California, 384 US 757; People v Kates, 53 NY2d 591, 594; People v Thomas, supra). Because rights of a constitutional dimension are not involved, cases concerning the voluntariness of a person’s consent to search, which does involve constitutional rights (e.g., US Const, 4th Amdt; NY Const, art I, § 12), are not controlling. For this reason, submission to a warning of the statutory consequences of the refusal to submit to a breath test does not compel the suppression of the test results in a prosecution for Penal Law violations.
The other grounds for suppression advanced by the defendant are also without merit. Miranda warnings need not be given prior to the administration of the test, nor is there any necessity for the presence of counsel (see People v Craft, 28 NY2d 274, 277-279; People v Gursey, 22 NY2d 224, 229; People v Kates, 77 AD2d 417, 419, affd 53 NY2d 591, supra; see, also, People v Stisi, 93 AD2d 951). Nor does the failure to specifically inform [2] the defendant that the test results might be used against him in other than Vehicle and Traffic Law prosecutions require suppression. Other than in a Miranda situation (Miranda v Arizona, 384 US 436), no such constitutional or legislative requirement has been brought to the court’s attention in this or *354 any other setting. For the most recent pronouncement reemphasizing the nonnecessity of such notice, see South Dakota v Neville (459 US_, 103 S Ct 916, 924, n 16).
For the foregoing reasons, defendant’s motion to suppress is denied in all respects. Defendant’s application for a hearing with respect to the general accuracy of the Smith and Wesson breathalyzer, model 900A, is granted, the date of such hearing to be arranged by agreement of all parties.
The court stresses that this decision, pending a hearing and proof by the defendant sufficient to meet his burden of establishing the reasonable likelihood of inaccuracy of the model 900A breathalyzer in a typical test setting because of radio interference, does not invalidate the presumptive reliability or continuing use of breathalyzer tests.
Lastly, the court wishes to express its gratitude to the members of the Criminal Defense League, as amicus curiae, for their excellent assistance.

. See National EJ, Nov. 8, 1982, p 5.

. People’s exhibit No. 1, the “DWI Warning” card, includes the warning: “3. Your refusal to submit to a chemical test, can be introduced into evidence against you at any trial, proceeding or hearing resulting from this arrest.