Glenn R. CORNETT, Appellant,

v.

STATE of Indiana, Appellee.

No. 1081S284.

Supreme Court of Indiana.

July 1, 1983.

Debra K. Luke, Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant Glenn R. Cornett was convicted of Murder at the conclusion of a jury trial in Lake Superior Court on March 4, 1981. The trial court sentenced Cornett to life imprisonment. Cornett now appeals.

Three errors are raised on appeal, concerning: 1) whether the trial court erred by admitting into evidence the results of spectrographic analysis; 2) whether the trial court erred by allowing a surprise witness to testify at trial; and, 3) whether the trial court failed to maintain an impartial and neutral position during the trial.

The evidence most favorable to the State reveals that on June 6, 1977, about 7:00 a.m., Hazel LaBona heard a knock on her door and a cry for help. Upon investigation, Mrs. LaBona found her neighbor, Mrs. Flora Isakson, in a badly beaten condition. The police arrived pursuant to a call made by Mrs. LaBona. The Isakson residence had been ransacked and Mr. Isakson's body was discovered in a bedroom. A gunshot wound to the neck had caused his death.

Approximately three years later, defendant Cornett's ex-wife, Phyllis Cornett, informed the police about the murder. Subsequent testimony revealed that Glenn Cornett, Phyllis Cornett, and William Shields, along with three other people, decided one night to burglarize the Isakson residence. The group drove in one car to the Isakson home. Once there, Glenn Cornett left the car. After a few minutes, Shields also left the car and approached the front of the house. As Shields entered the front door, Mrs. Isakson attempted to run past him. Shields and Cornett pushed Mrs. Isakson back into the house. · Cornett smacked her a couple of times and then shot her once. Phyllis Cornett then entered the house and both Phyllis and Shields heard another shot from a rear portion of the residence. Phyllis walked down a hallway and saw a man's foot in one of the bedrooms. Shields saw Mr. Isakson lying partially on a bed, with part of his foot extending past the bed. After Cornett found some money in the house, the group finally drove away.

I

Defendant Cornett argues that the trial court committed reversible error when it allowed an expert on voice spectrography to testify at trial. The defendant specifically argues that spectrographic analysis has not gained general acceptance in the scientific community to which it belongs, and any introduction of such evidence constitutes reversible error.

Phyllis Cornett was one of the witnesses who testified for the State about the defendant's involvement in the murder. After the State rested, the defense presented its case-in-chief. One of the witnesses called by the defense was attorney Calvin K. Hubbell. Mr. Hubbell testified that on September 18, 1980, Phyllis Cornett telephoned his office about 5:00 p.m. Hubbell recorded this conversation and it was played in open court. On the tape, the woman identified as Phyllis Cornett stated that she did not know anything about the murder. Hubbell testified that he had talked with Phyllis on a number of occasions when he represented her in another matter, and that he recognized her voice. Phyllis Cornett, however, denied under oath that she had made that phone call to Hubbell.

On rebuttal, the State introduced evidence by two voice spectrography experts. After listening to the original tape and a voice exemplar provided by Phyllis Cornett, and after examining the spectrograms produced by the tapes, both experts concluded that Phyllis Cornett did not make the phone call to Calvin Hubbell. The defense, in turn, introduced the testimony of another expert witness who stated that spectrographic analysis was not reliable and that fraud was being perpetrated on the courts of this country every time it was admitted into evidence.

This is a case of first impression in this jurisdiction. We have in the past allowed the introduction of voice exemplars, holding that court-ordered submission to such a "purely physical test" does not violate the privilege against compulsory self-incrimination. *Allen v. State,* (1981) Ind., 428 N.E.2d 1237, 1239; *Frances v. State,* (1974) 262 Ind. 353, 358, 316 N.E.2d 364, 366. Spectrographic analysis of voices, however, is far different from merely providing a voice exemplar. Basically, voice spectrography is founded on the premise that voices, like fingerprints, are unique to individuals. Some experts in the past have called the results of this scientific study "voiceprints", a term coined by scientists working for Bell Telephone Laboratories. C. Gray & G.

Kopp, *Voiceprint Identification, Report Presented to Bell Telephone Laboratories, Inc.* (1944), footnoted in William R. Jones, *Evidence vel non: The Non Sense of Voiceprint Identification,* 62 Ky.L.J. 301, 303. Courts and experts generally avoid use of the term "voiceprints" because it may potentially lead to an unwarranted association with fingerprint evidence, which has repeatedly been shown to be undeniably accurate in the identification of individuals. *See United States v. Williams,* (2d Cir.1978) 583 F.2d 1194, 1197, f.n. 5, *cert. denied,* (1979) 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77.

The theory behind identification by the voice spectrography method is that people have different vocal cavities and articulators. Thus, one expert's theory of voice uniqueness was based on the way "the articulators interacted with one another and the vocal cavities. The articulators include the lips, teeth, tongue, soft palate, and jaw muscles. The vocal cavities are the throat, nose, and the two oral cavities formed in the mouth by the positioning of the tongue." *People v. Rogers,* (1976) 86 Misc.2d 868, 874, 385 N.Y.S.2d 228, 233. Since every person has these unique anatomical characteristics, some experts feel that the sound produced through the interaction of these features should lead to a means of identifying people by their voices alone.

The spectrographic machine is a device which receives sound vibrations and records the visual image of these vibrations by a series of patterns on paper. This paper is mounted on a rotating drum and the pattern is burned on the paper. The display of the graphic patterns produced by this method is called a spectrogram. The graph represents a tri-dimensional plane with time shown on the horizontal axis, frequency shown on the vertical axis, and the relative amplitude of the voice's intensity displayed by the darkness of the lines.

Malcolm Hall, a detective sergeant in the Michigan State Police Department, was one of two witnesses who testified on behalf of

the State. Sergeant Hall stated that he was assigned to the Voice Identification Unit of the Forensic Science Laboratory. Hall received a Bachelor of Science Degree in Sociology and a Master of Arts Degree in Audiology and Speech Science. He had also completed the curriculum studies for a Ph.D. at the time of trial. Hall belonged to the Accoustical Society of America and was currently president of the International Association of Voice Identification. This latter organization was founded in 1972 and was made up of members who support voice spectrography. Hall had written various articles, including one published in *Human Communication* (University of Alberta, Edmonton) and his Master's Thesis was published through the Acoustical Society of America. Hall had previously testified before state and federal courts, and also before the Queen's Court in Ontario.

Sergeant Hall listened to the original tape, made a copy, and then copied it onto the sound spectrograph machine in order to produce a spectrogram. Phyllis Cornett then made a recording, speaking the same words as the unknown caller, and a spectrogram was produced from this tape. Hall testified that experts in voice spectrography listen to the two tapes (the original recording and the taped exemplar) and then compare the two spectrograms. Thus, there is both an aural and visual comparison. Hall concluded that the known voice (Phyllis Cornett) and the voice on the telephone did not belong to the same person.

Hall talked about the intravariables and intervariables involved in voice spectrography. Intravariables are the changes found within one individual's voice. Some factors which may alter a person's voice are fatigue, happiness, unhappiness or illness. The intervariables are differences found between the voices of two individuals. Unlike fingerprints, which remain constant, spectrograms thus show changes in the *same* voice. In addition, the spectrogram is not the primary evidence but a graphic means of examining the sounds produced. The supporting experts argue, however, that while intravariables are present, these changes are never greater than the inter-

variables. Thus, according to Hall, it is both possible to identify a voice and also tell the difference between two voices.

Hall stated that the process was as reliable as the criteria will permit and was generally accepted by those who work with voice spectrography and are familiar with its process. The drawbacks were that the recording of two individuals talking at the same time, or a speaker and such background noise as a baby crying or a dog barking, could not be examined by the above method. Hall admitted that a person's voice could be altered by stress, such as brought about by a criminal charge. Also, the time lapse between the recording of the two tapes could be a factor and there are always variances present in trying to reenact a phone conversation. Over ninety words were used from the tapes to make the positive elimination. Only 3% of the examinations result in either a positive identification or a positive elimination.

John A. McClung also testified for the State. His company engaged in consulting engineering and acoustics. McClung received both his Bachelor's Degree and Master's Degree from the University of Pittsburgh. McClung also received a Ph.D. in Speech Science from the same institution. Like Hall, McClung belonged to the International Association of Voice Identification and had some articles printed in various journals, including the American Journal of Physiology. McClung had testified at both the state and federal level.

McClung's testimony was in accord with Hall's. He stated that one can distinguish individuals by use of voice spectrograms and that there were five possible conclusions to reach when comparing spectrograms: positive elimination, positive identification, probable elimination, probable identification, or no conclusion at all. McClung agreed with Hall that Phyllis Cornett's spectrogram positively eliminated her as the caller to Hubbell's office. It took McClung six to eight hours to reach this decision and he also added that the longer the sample of spoken dialogue, the lower

the probability of error. The following testimony ensued when McClung was questioned about the reliability of voice spectrography and its acceptance by the scientific community:

"Q. Doctor, you say that the use of what you referred to as voice grams has a general acceptance within the scientific community?

A. No, sir. I stated that within those individuals who utilize sound Spectrograms for the purpose of identification of voice [it] has a general acceptance.

Q. And you said in general it is accepted?

A. Yes, sir.

Q. What do you mean, sir?

A. That at a minimum, the majority of those that are involved accept it as a reliable and valid process."

Dr. Harry Hollin, professor of linguistics, speech, and criminal justice at the University of Florida, offered testimony in opposition to the State's rebuttal evidence. Dr. Hollin received both his Bachelor's Degree and Master's Degree from Boston University and his Ph.D. from the University of Iowa. Hollin's specialty area is what he termed "acoustic phonetics" or "phonetic science" which is the study of human speech and how it is produced. He wrote numerous papers, some of which were printed in the Journal of Speech and Hearing Research. Hollin was elected fellow to the American Speech and Hearing Association, Acoustical Society of America, and the American Academy of Forensic Sciences. Hollin was also the founding director of the Institute for the Advanced Study of Communications Process. This institute studies the way that speech is transmitted and the way that it is received.

Dr. Hollin listened to the tapes and viewed the spectrograms. He was very strong in his attack against the introduction of such evidence. Analyzing previous studies, Dr. Hollin felt that they had not shown that voice spectrography was useful in identifying voices. Dr. Hollin said, "[N]o one has shown yet whether intra, within, the speaker variable is always less than

speaker variability, inter-speaker variability or speaker variability among everybody else. And unfortunately, this is the basis upon which any speaker identification system must be based. . . ." Even with sophisticated systems used by companies like Texas Instruments, where speaker verifications are used as one method to prevent unauthorized access to the computers, Dr. Hollin stated other safeguards are also needed. As he explained, one's weight and signature on a special card are also used as a screening device. Finally, Hollin said the relevant scientific community is made up primarily of phoneticians and engineers working in speech communication. Dr. Hollin felt that only law enforcement agencies and people working exclusively with spectrograms believed in its reliability.

Various federal and state courts have considered the admissibility of spectrographic analysis and are split on the issue:

*United States v. Williams,* (2d Cir.1978) 583 F.2d 1194, *cert. denied* (1979) 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (held admissible); *United States v. McDaniel,* (D.C.Cir.1976) 176 U.S.App.D.C. 60, 538 F.2d 408 (held not admissible); *United States v. Baller,* (4th Cir.1975) 519 F.2d 463, *cert. denied* (1975) 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (held admissible); *United States v. Williams,* (S.D.N.Y. 1977) 443 F.Supp. 269 (held admissible); *United States v. Sample,* (E.D.Pa.1974) 378 F.Supp. 44 (held sufficiently reliable for admission in probation revocation hearing); *People v. Kelly,* (1976) 17 Cal.3rd 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (held not admissible); *State v. Williams,* (Me.1978) 388 A.2d 500 (held admissible); *Reed v. State,* (1978) 283 Md. 374, 391 A.2d 364 (held not admissible); *People v. Tobey,* (1977) 401 Mich. 141, 257 N.W.2d 537 (held not admissible); *State v. Williams,* (1983) 4 Ohio St.3rd 53, 446 N.E.2d 444 (held admissible); *Commonwealth v. Topa,* (1977) 471 Pa. 223, 369 A.2d 1277 (held not admissible).

In a recent case, *Peterson v. State,* (1983) Ind., 448 N.E.2d 673, we held that the trial court erred in admitting hypnotically

prompted testimony. In so doing, we agreed with the holding in *State v. Mack,* (Minn.1980) 292 N.W.2d 764, in which the Minnesota Supreme Court determined that hypnotically prompted testimony does not meet the standard announced in *Frye v. United States,* (D.C.Cir.1923) 293 F. 1013. *Mack, supra,* 292 N.W.2d at 768. The *Frye* court, dealing with the admission of polygraph evidence, held that while courts are willing to admit expert testimony about a scientific principle or procedure, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1015.

■ We hold today that the same standard should apply to voice spectrography. Before ruling on this issue, we have to decide whether the relevant scientific community should be made up of only those scientists who use spectrograms for voice identification, or whether the community should also embrace those scientists who use spectrograms for other purposes in connection with the human voice. Dr. Hollin felt that the relevant scientific community did not consist solely of those people who use and employ voice spectrography for identification purposes. In a well written opinion, *People v. Collins,* (1978) 94 Misc.2d 704, 405 N.Y.S.2d 365, the defense expert, in testimony similar to Dr. Hollin's, stated that,

> "the relevant field of inquiry is acoustic phonetics, and stated that he would add experts in some other fields such as linguists and speech scientists (for obvious reasons, since human speech is after all, the subject of the test), psychologists (ostensibly to study the effects of stress on human speech), and engineers (to study the effects of distortion inherent in the electronic components associated with this test)."

*Id.* at 708, 405 N.Y.S.2d at 368.

We agree that the relevant scientific community should be made up of linguists, psychologists, and engineers, in addition to the people who use voice spectrography for identification purposes. Limiting the community to only the latter group would be too narrow and misleading. It is natural, of course, that the people actively employing the new scientific process are urging its introduction into evidence. However, just as with hypnotically prompted evidence, it appears that only a small group of the same people testify again and again in order to get this evidence admitted. It appears that they have failed to convince their peers to join them in this crusade.

■ Thus, after reviewing testimony in the record, opinions of different jurisdictions, and articles from law reviews and scientific journals, we find that voice spectrography has not gained general acceptance in the scientific community. The Maryland court in *Reed v. State, supra,* wrote that "[f]airness to a litigant would seem to require that before the results of a *scientific* process can be used against him, he is entitled to a *scientific* judgment on the reliability of that process." (emphasis in original). 283 Md. at 385, 391 A.2d at 369–70. The trial court and jury should not, on a case by case basis, be called upon to resolve a conflict in the scientific community concerning the validity of a new scientific process. If the experts themselves cannot agree about the reliability of a scientific technique, the courts should restrain its introduction because of potential harm and prejudice to the parties involved.

■ Although we hold that the trial court erred in introducing the above evidence, we do not find that the substantial rights of the defendant have been affected; thus, any error is harmless error. *See Scott v. State,* (1973) 260 Ind. 67, 292 N.E.2d 252; Ind.R.Tr.P. 61; *see also United States v. McDaniel, supra* (admission of voice spectrography evidence was harmless error under the circumstances). Calvin Hubbell's testimony about the phone call was offered to impeach Phyllis Cornett's credibility. Therefore, the evidence on voice spectrography was limited and was offered only as rebuttal evidence. In addition, it was cumulative of Phyllis Cornett's denial that she made the phone call. "In Indiana, it is well settled that the introduction of other-

wise inadmissible evidence which is merely cumulative and not decisive of guilt is not prejudicial error (citations omitted)." *Mitchell v. State*, (1972) 259 Ind. 418, 424, 287 N.E.2d 860, 863. Finally, Phyllis testified at great length about the events of this murder and her testimony was corroborated by William Shields. Prior to trial and while the police investigation was still going on, Phyllis had described to the police various objects, such as a flashlight, wallet, and gloves, which were left at the Isakson residence. This also was corroborated by the police and the items were introduced into evidence. Under the circumstances, it cannot be said that the introduction of the voice spectrography evidence resulted in anything but harmless error.

## II

Defendant Cornett claims reversible error occurred when the State produced a surprise witness, William Shields, on the morning of trial, February 24, 1981. It seems that William Shields had recently been convicted in a separate trial of murdering Mr. Isakson. On February 23, Shields informed the State that he would be willing to testify against the defendant. The State notified the defense about this development later that afternoon.

The following day, February 24, the defense made a motion for a continuance before the start of the trial. Defense counsel alleged that he needed time to depose Shields. The State acquiesced in the motion but the trial court denied any continuance. At the end of the first day of trial, however, the trial court, without explaining the reason, informed the jury that there would be a one-day continuance on the 25th, and that the trial would resume on the 26th. The defense managed to depose Shields on the 25th; Shields subsequently testified on the afternoon of February 26.

When a defendant is confronted with a surprise witness, the usual response is to move for a continuance. *Siblisk v. State*, (1975) 263 Ind. 651, 656, 336 N.E.2d 650, 653. Even though a continuance was granted, the defendant persists in claiming that re-

versible error occurred and cites *Johnson v. State*, (1979) 179 Ind.App. 28, 384 N.E.2d 1035 in support. *Johnson* dealt with the State's violation of a discovery order. In that case, defendant Johnson had been charged with attempting to murder his girl friend by shooting her with a handgun. The trial court had ordered that all discovery be disclosed by March 30, 1977. At that time, the State was required to disclose the names of the witnesses it intended to call at trial. Despite the trial court's order, over four months later and only three days prior to trial, the State disclosed that a firearms expert would also testify at trial. Johnson moved for a continuance but the trial court denied the motion. It did, however, delay the firearms expert's testimony for one day.

We believe that the facts in this case distinguish it from *Johnson*. The Court of Appeals felt that delaying the witness' testimony for one day was an inadequate remedy for a number of reasons. First, the firearms expert's testimony was crucial to Johnson's defense. Johnson, who had to disclose his defense by March 30, had claimed all along that the gun had accidentally discharged. Thus, the State was able to procure expert testimony but failed to notify Johnson that it intended to introduce this expert testimony to counter his defense. *Id.* 384 N.E.2d at 1039. Second, the Court of Appeals felt a continuance was the proper remedy, *Id.*, but held that delaying the witness' testimony by one day did not satisfy the request for a continuance:

"We do not agree with the State's contention that the one day delay in effect satisfied Johnson's request for a continuance. A continuance would have terminated the trial proceedings and at least provided counsel for Johnson with one workday to prepare to depose the expert Roberts on the technical subject matter of firearms. As it was, Johnson's counsel was occupied with trial during the day, deposed Roberts that evening, and was expected to cross-examine Roberts the following day."

*Id.* 384 N.E.2d at 1040.

■ Here, we have a situation where a witness is made available because of his

recent conviction and subsequent willingness to testify. There was no deliberate or inadvertent concealment on the part of the State concerning Shield's testimony. In addition, although the trial court initially denied a request for continuance, it later granted one. Thus, defense counsel was given one day's time in which to depose Shields and prepare for cross-examination. We fail to see how any prejudice attached to defendant Cornett and find that no reversible error occurred when Shields testified at trial.

### III

■ Finally, defendant Cornett alleges that the trial judge failed to maintain an impartial and neutral position during the course of the proceedings. Defendant points to three instances where the trial judge abandoned his position of impartiality: referring to defense counsel's questions as "facetious"; questioning defense counsel's sincerity in cross-examination of a witness; and by referring to defense counsel's examination of another witness as "ludicrous." We note that on the last two instances, defense counsel failed to object to the trial judge's remarks and move for a mistrial; these alleged errors are waived on appeal. *Haynes v. State,* (1982) Ind., 431 N.E.2d 83, 85; *Bray v. State,* (1982) Ind., 430 N.E.2d 1162, 1165.

■ Without question, the trial court has a duty to remain impartial and refrain from making unnecessary comments or remarks. *Lawson v. State,* (1980) Ind., 412 N.E.2d 759, 767; *Brannum v. State,* (1977) 267 Ind. 51, 53, 366 N.E.2d 1180, 1182. The trial court also has the duty to manage and control the proceedings which are conducted before it. *Lawson v. State, supra,* 412 N.E.2d at 768. An examination of the record does not show that the trial court acted improperly. Defendant points to the following colloquy as evidence of judicial misconduct:

"BY MR. McDOWELL:

Q Did you promise something to William Shields or were you involved in the promise given to William Shields?

A No, I didn't; and no, I wasn't.

Q You don't like being questioned like this, Mr. Todd?

A It doesn't bother me.

Q It doesn't bother you. What's this business about taking off your glasses, are you trying to be dramatic for the jury or something?

A No sir, they weigh a little heavy on the nose.

Q I see. What was the color of that car at that location back in June of 1977?

A I don't recall.

Q You don't recall. Did you get information on that?

A Yes, I did.

Q But you conveniently forgot that as well, is that correct?

A It's been quite a time.

Q Been quite a time? You are more concerned about your informants and what you give to them, is that right?

BY MR. BELLA:

Your Honor, the witness is not competent to answer the questions.

BY THE COURT:

Well, it's (sic) really wasn't a question. Mr. McDowell gets the feeling that some of these questions are facetious.

BY MR. McDOWELL:

Well that's the Court being an advocate in this case—

BY THE COURT:

Not at all.

BY MR. McDOWELL:

I object to that comment.

BY THE COURT:

I object to counsel's attitude.

BY MR. McDOWELL:

Furthermore, I move for a mistrial.

BY THE COURT:

Denied. You should show more respect both to the Court and the witnesses, Mr. McDowell. We'll stand in recess until 1:30."

Record at 248–49.

We fail to see how these comments show that the trial court abandoned its position of impartiality and neutrality. There is no

prejudice here that would manifest the necessity for a new trial. *Kennedy v. State,* (1972) 258 Ind. 211, 280 N.E.2d 611.

The trial court is in all things affirmed.

GIVAN, C.J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.