**David Shawn POPE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–86–00235–CR.**

Court of Appeals of Texas, Dallas.

Aug. 4, 1988.

John H. Hagler, Dallas, for appellant.

Pamela Sullivan Berdanier, Dallas, for appellee.

Before McCLUNG, HECHT[1] and JAMES[2], JJ.

## ON MOTION FOR REHEARING

JAMES, Justice.

We grant the State's motion for rehearing and withdraw our prior opinion. The following is now the opinion of the court.

A jury convicted David Shawn Pope of aggravated sexual assault and assessed punishment at forty-five years' imprisonment. On appeal, he complains that the trial court reversibly erred: 1) by admitting spectrographic evidence; and 2) by giving unconstitutional jury instructions regarding parole and good time. We overrule appellant's points of error, and affirm the judgment of the trial court.

The record shows that at approximately 10:15 p.m. on July 24, 1985, a man came to the front door of S____ L____'s apartment and asked, "Is Pat there?" When S____ L____, the complainant, replied that no one named Pat lived at that apartment, the man left.

At approximately 6:00 a.m. on July 25, S____ L____ awoke to find a man standing over her, holding a steak knife. He raped her. After the assault, S____ L____ got up from her bed, followed appellant toward the patio doors and stood next to him. Subsequently, the man placed S____ L____ in a closet, warned her, "Now don't come out for a long time and don't scream and don't tell anybody, because remember I

know where you live," and fled. She waited a short time in the closet and then called the police.

Complainant described her rapist to the police as a young white male, around 5′ 8″ tall, 140 pounds, blond, slim, very tan, and wearing beige pants and no shirt. She reported that the steak knife the man held matched a set of four that she owned. After the perpetrator left her apartment, S____ L____ found only three from the set. While the police were at her apartment on July 25, the complainant received a telephone call from a man she referred to as "the rapist." Complainant recognized the voice and handed the phone to a police officer.

On July 27 complainant again received a call from the rapist. Complainant was away from her home, and her answering machine recorded the call. She turned this tape over to police, and the tape was admitted into evidence and played for the jury.

Complainant was called again on July 29. The caller said that on the night of the rape he had knocked on her door and asked for Pat. This call went unrecorded because complainant answered the telephone. S____ L____'s answering machine only recorded calls if she did not pick up the telephone receiver. Complainant bought a machine to record calls as she talked.

On August 2, she received a fourth call from the perpetrator. The call lasted approximately ten minutes and the perpetrator called back a short time later. At police request, the complainant engaged in an extended conversation with him. The tape of these conversations was admitted into evidence as well. The complainant identified the appellant in open court as the man who raped her. She also testified that because she recognized his voice from the assault, appellant was the telephone caller. Although complainant was unable to pick out the appellant in a photographic lineup,

---

1. The Honorable Nathan L. Hecht, Justice, succeeded the Honorable Lawrence B. Mitchell, Justice, at the expiration of his term, which was between the time the case was submitted and the time it was decided. Justice Hecht has reviewed the briefs and record before the Court.

2. The Honorable John A. James, Jr., Justice, retired, Court of Appeals for the Tenth District of Texas at Waco, sitting by assignment.

she did identify appellant in a live lineup on August 28.

The State next called William David Thurman, a Garland police officer who arrested appellant on August 28, 1985, at 6:30 a.m. on the premises of the Eastgate Apartment complex where the complainant lived. Officer Dennis Wheatley testified that he found a 9½" knife with the tip broken off and a pair of white pants in the trunk of appellant's car.

Officer Wheatley further testified that he had arranged for appellant voluntarily to make a "control" recording of his voice, reading parts of the taped transcripts using complainant's recording equipment. Officer C.G. Young testified that he was present with appellant when the recording was made and that the appellant was informed that the police wanted to compare his voice sample to the voice on the complainant's recordings.

Larry Howe Williams, a Houston police officer, testified that he was a voice identification examiner and had taken around 1,000 spectrograms. Williams, testifying as an expert spectrograph examiner, stated that voice print identification is a process by which a spectrogram is produced by passing sound waves through a spectrograph such that known and unknown voices can be compared.

The State next called Dr. Henry Truby as an expert in the science of spectrography and bio-acoustics, holding a Ph.D. in Acoustic Phonetics and having worked in the field for 40 years. Dr. Truby, after explaining how spectrography works, testified that he had compared spectrograms of the appellant's voice on the control tape to spectrograms of the voice on the complainant's answering machine tapes and, in his expert opinion, both tapes recorded the same voice—that of appellant.

The defense called Stuart R. Ritterman, a Professor of Communicology at the University of South Florida, as an expert to dispute the scientific validity of spectrography. The defense also called Craig Furche, a friend of appellant, who testified that appellant stayed and worked with him on and off during July and August 1985, and

that he could not remember appellant not riding to work with him at around 6:30 a.m. the morning of the rape.

The appellant testified on his own behalf that he had lived at the Eastgate Apartments until June 1985 when he was evicted. The appellant denied committing the rape, insisting that at the time he must have been either asleep or on his way to work because that was what he usually did at 6:00 a.m. on weekdays. On cross-examination, appellant testified that he had lived out of his car on the Eastgate grounds on and off during July. Appellant testified that he made the control voice tape to prove his innocence and that he was aware of the intended voice comparison.

In rebuttal, the State called police officer Larry Wilson who testified that on October 30, 1985, appellant told Wilson that he had probably been sleeping in his car on the night of the rape and did not mention his friend Craig Furches. The State also called Linda Gilles, an assistant manager of the Eastgate Apartments, who testified that appellant was evicted in June 1985 and created a problem by continuing to show up on the Eastgate grounds. Gilles further testified that the appellant had a bad reputation for truthfulness in her opinion.

The jury found appellant guilty of aggravated sexual assault. At punishment, the appellant testified on his own behalf, continuing to assert his innocence. The jury assessed punishment at 45 years' confinement in the Texas Department of Corrections.

■ Appellant complains that the trial court erred in admitting the spectrographic evidence against him. We believe this question on the admissibility of "voiceprint" evidence to be of first impression in Texas. We need not, however, address this issue because the overwhelming evidence against appellant renders this error, if any, harmless. In determining whether there was harmful error in admitting evidence that we assume but do not decide was improper, the facts and circumstances of the individual case must be considered.

*Bass v. State,* 622 S.W.2d 101, 104 (Tex. Crim.App.1981).

The complainant had the opportunity clearly to view her attacker. She testified that she stood right next to him near her patio doors after the rape. S___ L___ identified the appellant as the rapist in a live lineup as well as in open court. She had ample opportunity to hear the perpetrator's voice during the incident and over the phone. Complainant testified that the *voice of* appellant was the same voice that she heard at the rape and on the telephone. The jury also had the opportunity to hear the tapes from complainant's answering machine and to compare that voice with the appellant's. The police found a knife and a pair of slacks matching the description of those used during the rape in the trunk of appellant's car. The jury was able to compare the knife found in the car with one from S___ L___'s set.

Appellant's alibi witness, Furches, could not remember precisely where appellant was on the morning of the offense. Furches testified that appellant probably was with him because they usually rode to work together around 6:00 a.m. on weekdays. Conversely, Wilson testified that appellant told him he may have been sleeping in his car on the apartment complex grounds on that date. Against these general and conflicting statements is juxtaposed specific evidence identifying appellant as the assailant.

Where there is not a reasonable possibility that improperly admitted evidence contributed to an appellant's guilt, reversal is not required. *Bird v. State,* 692 S.W.2d 65, 70 (Tex.Crim.App.1985); TEX.R.APP.P. 81(b)(2). In this case we conclude that the minds of the average jury would not have found the State's case less persuasive had the testimony been excluded. *See Bird,* 692 S.W.2d at 70. The error, if any, was harmless beyond a reasonable doubt. The role of the spectrograms was cumulative. They did not contribute to the conviction. *See United States v. Addison,* 498 F.2d 741, 747 (D.C.Cir.1974). Appellant's first point of error is therefore overruled.

In appellant's second and third points of error, he complains that the trial court erred by giving the instructions on parole and good time laws required by article 37.-07, section 4(a), Texas Code of Criminal Procedure. The court of criminal appeals has declared these instructions to be unconstitutional. *Rose v. State,* 752 S.W.2d 529, 535, 537 (Tex.Crim.App.1987), *modified on rehearing,* (Tex.Crim.App.June 15, 1988). Thus, the trial court erred in including these instructions in the charge to the jury. We must therefore determine whether such error requires reversal.

The standard to be used to determine whether the charging error in this case was harmful is prescribed by rule 81(b)(2), Texas Rules of Appellate Procedure. *Rose,* on reh'g at 553. That rule states:

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

The application of this rule in this case is remarkably similar to its application in *Rose.*

■ Similar to the instruction in *Rose,* the trial court gave the following instruction prior to the parole law instruction:

> You are not to discuss among yourselves how long the defendant will be required to serve any sentence you decide to impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor of the State of Texas and are, consequently, no concern of yours.

This instruction had the same curative effect in this case as it had in *Rose,* although it was given in *Rose* subsequent to the court's charge on parole law.

If anything, the facts of this case we have noted above called for a harsher sentence than the jury assessed. Not only did appellant rape S___ L___ at knifepoint, he continued to call her, threatening to kill her. Consider the facts of this case no less heinous than those in *Rose.* The jury could

have sentenced appellant to 99 years or life imprisonment, and imposed a $10,000 fine. The State asked the jury to sentence appellant to not less than 75 years' imprisonment. Instead, the jury assessed appellant's sentence midrange at 45 years' imprisonment. In *Rose*, appellant had five prior felony convictions, whereas appellant in the instance case had none. However, in *Rose*, appellant received the maximum sentence of life imprisonment, while appellant in the instance case received far less than the maximum sentence.

After carefully viewing the record of the instant case in light of *Rose* and rule 81(b)(2), we conclude, beyond a reasonable doubt, that the error in giving the jury the parole law instruction made no contribution to the punishment assessed by the jury. We therefore overrule appellant's second and third points of error.

AFFIRMED.

McCLUNG, Justice, dissenting.

Because I believe that the trial court erred in admitting expert testimony concerning voice identification based on spectrographic analysis, and that such error contributed to the conviction, therefore, was not harmless, I write this dissent.

The question whether spectrographic evidence is admissible in Texas is one of first impression. The majority avoids this issue under the security blanket of the "harmless error" doctrine. Avoidance of difficult questions of law is always tempting, but utilization of the harmless error doctrine in this case is inappropriate and insupportable.

The principles of spectrographic analysis were explained in detail in *United States v. Williams*, 583 F.2d 1194, 1196–97 (2nd Cir. 1978) *cert. denied* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979) (footnotes omitted):

### The Mechanics of Speech

Sound consists essentially of pressure waves of varying frequencies and amplitudes. The pressure waves associated with speech are initiated when air is exhaled past the vocal cords. The resulting vibration of the vocal cords produces the pressure waves.

Frequency and intensity are important speech characteristics involved in voice analysis. Frequency determines the pitch of the sound. It is delineated by the time interval between successive vocal cord vibrations and the speed at which air molecules are vibrated thereby. Intensity is loudness, and is a function of the number of air molecules vibrating at a given frequency. All speech is composed of several frequencies produced simultaneously; a fundamental frequency and several overtones having frequencies which are even multiples of the fundamental.

An individual's speech is created by a complex physiological and mechanical operation. The waves generated by the vocal cords are modified by vocal cavities (throat, nose and cavities formed in the mouth by positioning the tongue), and by articulators (lips, teeth, tongue, palate and jaw muscles). The vocal cavities act as resonators which cause sound energy to be reinforced in specific sound spectrum areas, dependent upon the size, shape and interrelationship of the cavities. The articulators cooperate in a controlled dynamic interplay in the production of intelligible speech. The manner in which each of us manipulates his articulators when speaking has been developed by a process of imitation and trial and error.

Voice analysis thus rests on the nonlikelihood that two individuals would have identical vocal cavities and identical dynamic patterns of articulator manipulation, and on the inability of an individual to change or disguise the particular voice characteristics created by his unique combination of cavities and articulator manipulative patterns. Spectrographic voice analysis involves the reflection of voice characteristics in a "spectrogram" produced by a "spectrograph."

### The Spectograph and Spectogram

The spectrograph is an electromagnetic instrument which analyzes sound and

disperses it into an array of its time, frequency and intensity components. The array is graphically displayed in a spectrogram.

The spectrograph operator is supplied with two magnetic tapes—one with a known, the other with an unknown, voice. He listens for similar words and phrases on both tapes. The preferred cue words are: THE, TO, AND, ME, ON, IS, YOU, I, A and IT. Spectrograms are then made of the portions of the tapes on which the selected words and phrases occur.

In producing spectrograms, a tape is placed in the spectrograph. The spectrograph electronically scans the tape and generates electronic signals representative of the components of the sound. The signals are fed to a variable filter, which adjusts the position of a stylus. The stylus burns thin parallel lines on current-sensitive paper wrapped around a rotating drum. The stylus traces a horizontal line, representing a single frequency, the darkness of the linetrace varying as it progresses. At the end of each line, the stylus returns to trace out another line, representing a slightly higher frequency, and so on, producing a bar spectrogram.

The spectrograms of the same words and phrases are then compared visually, to determine whether they were made by the same speaker. The bar spectrogram indicates time along the horizontal axis, frequency along the vertical axis, and intensity by varying shades of darkness in the pattern. The unique speech characteristics of the individual whose voice is being analyzed produce spectrogram patterns of vocal energy at the various frequency levels. Though it is not necessary that two spectrograms be identical, there must be exhibited a sufficient number of similar spectrogram patterns, called "matches," to warrant a conclusion that they were produced by the same person.

## STANDARDS OF ADMISSIBILITY

The first question to be answered is what is the legal standard to apply in determining the admissibility of spectrographic evidence.

An expert's testimony derives its value from special knowledge and experience which enable him or her to draw inferences more reliably than the jury can unaided. *Holloway v. State*, 613 S.W.2d 497, 501 (Tex.Crim.App.1981). Thus, courts admit expert testimony when it is demonstrated that: 1) the expert is competent and qualified to testify; 2) the subject is one upon which the aid of an expert will assist the jury; and 3) the testimony does not state a legal conclusion. *Hopkins v. State*, 480 S.W.2d 212, 218 (Tex.Crim.App.1972). If a witness is qualified to give an opinion, it may pertain to an ultimate issue of fact. *Id.* Generally, therefore, expert testimony will be admissible if it can meet this "helpfulness" standard.

When an expert is testifying about a novel area of scientific expertise, however, courts have traditionally crafted an addition to the helpfulness test. This requirement exists because of a perceived need for an obstacle to the unrestrained admission of evidence based upon new scientific principles. The policy reasons behind this additional burden to admissibility are the "... misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature" and the guarantee that a reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. *Reed v. State*, 283 Md. 374, 391 A.2d 364, 370 (1978).

The traditional test used to achieve these goals was announced in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). The court stated:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduc-

tion is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

The beneficial reasons for utilizing the *Frye* test are well stated in the *Reed* case where it is said:

There are, however, compelling reasons which justify the *Frye* principle.

Fairness to a litigant would seem to require that before the results of a scientific process can be used against him, he is entitled to a *scientific* judgment on the reliability of that process.[1] As stated by Judge McGowan, speaking for the court in *United States v. Addison,* 498 F.2d 741, 743–44 (D.C.Cir.1974):

[T]he *Frye* standard retards somewhat the admission of proof based on new methods of scientific investigation by requiring that they attain sufficient currency and status to gain the general acceptance of the relevant scientific community. This is not to say, however, that the *Frye* standard exacts an unwarranted cost. The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice.

This is an especially significant consideration with regard to those scientific techniques in which highly subjective judgments are based upon the data received from sophisticated mechanical devices. In these circumstances, the apparent objectivity of the machine may suggest a degree of certainty inconsistent with the subjective aspects of the enterprise.[2] *United States v. Addison, supra,* 162 U.S.App.D.C. at 202, 498 F.2d at 744; *People v. Kelly, supra.* As the Supreme Court of California stated in *Kelly* ( [17

Cal.3d 24] 130 Cal.Rptr. at [144] 149, 549 P.2d [1240] at 1245):

... *Frye* was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles ... Several reasons founded in logic and common sense support a posture of judicial caution in this area. Lay jurors tend to give considerable weight to 'scientific evidence' when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '... misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' (*Huntingdon v. Crowley, supra,* 64 Cal. 2d 647 at p. 656, 51 Cal.Rptr. 254 at p. 262, 414 P.2d 382 at p. 390; ....) As stated in *Addison, supra,* in the course of rejecting the admissibility of voiceprint testimony, 'scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury....' (*United States v. Addison, supra,* 498 F.2d at p. 744).

In addition to the advantage of substituting scientific for lay judgment as to scientific reliability, the court in *United States v. Addison, supra,* 162 U.S.App. D.C. at 202, 498 F.2d at 744, pointed out that the *Frye* test:

... protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validly of a scientific determination in a particular case ... [T]he ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential.

---

1. [Footnote 7]: In 1665, in what may be one of the first reported instances of expert testimony, a certain Dr. Brown of Norwich, testifying at a trial, delivered of himself the expert scientific opinion that the accused were witches and, by practicing their witchcraft at the devil's bidding, had bewitched several children. The accused were found guilty and hanged. A Trial of Witches at Bury St. Edmonds, 6 Howell's State Trials 687, 697 (1665). No issue seems to have been raised in that case concerning the validity of the process for determining whether one was a witch.

2. [Footnote 8;] *See, e.g.,* Highleyman, *The Deceptive Certainty of the 'Lie Detector,'* 10 HASTINGS L.J. 47, 63 (1958): "[T]he use of 'lie detector' evidence invites confusion between (1) the reliability of the objective physiological facts which are recorded by the polygraph, and (2) the reliability of the subjective inferences of truth or deception which are drawn from those facts by the examiner."

While the *Frye* test has been the most widely accepted standard governing the admissibility of scientific evidence produced by novel techniques, it has not been without its critics. For a detailed discussion of the concerns voiced by critics of *Frye*, see *Jones v. State*, 716 S.W.2d 142, 145 (Tex. App.—Austin 1986, pet. refused).

The *Jones* Court as well as other courts have suggested, as an alternative to the *Frye* test, utilization of the traditional standards of relevancy and the need for expertise to govern the admissibility of scientific evidence before the jury. *See Jones*, 716 S.W.2d at 154; C. McCORMICK, McCORMICK ON EVIDENCE 203 (1984). "Any relevant conclusions supported by a qualified expert witness should be received unless there are distinct reasons for exclusion. These reasons are the familiar ones of prejudicing or misleading the jury or consuming undue amounts of time." C. McCormick, *supra* at § 203.

While I share some of the concerns expressed about the problems inherent in *Frye*, I nevertheless would hold that the *Frye* test is the proper standard to apply in determining the admissibility of this evidence. Whenever the Court of Criminal Appeals has had occasion to consider the admission of novel scientific evidence it has always applied the "generally accepted in the scientific community" standard first enunciated *Frye*. *See Cain v. State*, 549 S.W.2d 707 (Tex.Crim.App.1977) *cert. denied* 434 U.S. 845, 98 S.Ct. 149, 54 L.Ed.2d 111 (1977); *Romero v. State*, 493 S.W.2d 206 (Tex.Crim.App.1973); *McKay v. State*, 155 Tex.Cr.Rptr. 416, 235 S.W.2d 173 (1950). It is well settled that decisions of a court of last resort must be regarded as law and should be followed by intermediate courts, regardless of their views as to the correctness thereof, until reversed or overruled by the court rendering them. *Abdnor v. Ovard*, 653 S.W.2d 793 (Tex. Crim.App.1983); *Patterson v. State*, 654 S.W.2d 825, 827 (Tex.App.—Dallas 1983, pet. ref'd).

## DETERMINING ADMISSIBILITY

I first note that the various federal and state courts which have considered the admissibility of spectrographic evidence are split on the issue:

*United States v. Williams*, 583 F.2d 1194 (2nd Cir.1978), *cert. denied* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979) (Fed.R.Evid. 702 applied, held admissible); *United States v. Baller*, 519 F.2d 463 (4th Cir.1975) *cert. denied* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975) (McCormick test applied, held admissible); *United States v. Franks*, 511 F.2d 25 (6th Cir.1975) *cert. denied* 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975) (McCormick test applied, held admissible); *United States v. Addison*, 498 F.2d 741 (D.C.Cir.1974) (Frye test applied, held inadmissible); *State v. Gortarez*, 141 Ariz. 254, 686 P.2d 1224 (1984) (Frye test applied, held inadmissible); *People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976) (Frye test applied, held inadmissible); *Cornett v. State*, 450 N.E.2d 498 (Ind.1983) (Frye test applied, held inadmissible); *State v. Williams*, 388 A.2d 500 (Me.1978) (M.R.Evid. 702, 403, 402, & 401 applied, held admissible); *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978) (Frye test applied, held inadmissible); *People v. Tobey*, 401 Mich. 141, 257 N.W.2d 537 (1977) (Frye test applied, held inadmissible); *State Ex Rel Trimble v. Hedman*, 291 Minn. 442, 192 N.W.2d 432 (1971) (McCormick test applied, held admissible for corroboration purposes only); *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977) (Frye test applied held inadmissible); *State v. Wheeler*, 496 A.2d 1382 (R.I.1985) (McCormick test applied, held admissible); *Alea v. Florida*, 265 So.2d 96 (Fla.App.1972) (McCormick test applied, held admissible for corroboration purposes only); *State v. Free*, 493 So.2d 781 (La.Ct.App.1986) (McCormick test applied, held inadmissible); *Commonwealth v. Lykus*, 367 Mass. 191, 327 N.E.2d 671 (1975) (Frye test applied, held admissible); *State v. Cary*, 99 N.J.Super. 323, 239 A.2d 680 (Law Div.1968) (Frye test applied, held inadmissible); *People v. Bein*, 114 Misc. 2d 1021, 453 N.Y.S.2d 343 (Sup.Ct.1982) (Frye test applied, held admissible); *Peo-*

*ple v. Collins,* 94 Misc.2d 704, 405 N.Y.S. 2d 365 (Sup.Ct.1978) (Frye test applied, held inadmissible); *State v. Olderman,* 44 Ohio App.2d 130, 336 N.E.2d 442 (App.1975) (Frye test applied, held admissible).

The threshold task in applying *Frye* is to determine the particular scientific field to which spectrographic analysis belongs. *Gortarez,* 686 P.2d at 1233. The identity of the relevant scientific community depends, of course, upon the particular technique in question. Members of the relevant scientific community generally will include those whose scientific background and training sufficiently allow them to understand the novel scientific test and form a judgment about it. When dealing with spectrographic analysis, the courts have held the relevant scientific community to include not only those directly involved in spectrographic analysis, but also those involved in such fields as acoustical engineering, acoustics, communications, electronics, linguistics, phonetics, physics, speech communications, psychology, physiology, medicine and anatomy. *Gortarez,* 686 P.2d at 1233; *Kelly,* 549 P.2d at 1246; *Cornett,* 450 N.E.2d at 503. Because, under *Frye,* the court must be able to find the procedure in question to be "generally accepted as reliable by the *larger scientific community in which it originated," People v. Shirley,* 31 Cal.3d 18, 54 n. 32, 181 Cal. Rptr. 243, 264 n. 32, 723 P.2d 1354, 1375 n. 32 (1982), I would hold that disinterested and impartial experts in the fields just named must generally accept the technique of spectrographic analysis before it is admissible into evidence in this state.

The next step in applying *Frye* is determining whether spectrographic analysis has reached a level of "general acceptability" within this group. After reviewing numerous reports contained in the scientific literature I conclude that voice identification by spectrographic analysis does not meet the *Frye* requirements of general acceptance in the relevant scientific community at this time.[3]

**3.** No attempt is made here to summarize each of the many scientific reports and legal commentaries noted on this subject. I merely list several of the more informative articles. These articles adequately demonstrate the lack of general acceptance of the reliability of spectrographic analysis. *See* Black, Lashbrook, Nash, Oyer, Pedrey, Tosi & Truby, *Reply to Speaker Identification by Speech Spectrograms: Some Further Observations,* 54 J.ACOUST.SOC'Y AM. 535 (1973); Bolt, Cooper, David, Denes, Pickett & Stevens, *Speaker Identification by Speech Spectrograms: A Scientists' View of its Reliability for Legal Purposes,* 47 J.ACOUST.SOC'Y AM. 597 (1970); Bolt, Cooper, David, Denes, Pickett & Stevens, *Speaker Identification by Speech Spectrograms: Some Further Observations,* 54 J.ACOUST.SOC'Y AM. 531 (1973); Boren, *Voiceprint—Staging a Comeback,* 3 U.SAN.FERN.V.L. REV. 1 (1974); Cederbaums, *Voiceprint Identification: A Scientific & Legal Dilemma,* 5 CRIM L.BULL. 323 (1969); Comment, *Evidence: Admissibility of Spectrographic Voice Identification,* 56 MINN.L.REV. 1235 (1972); Comment, *Evidence—Scientific Evidence—Voice Identification Held Inadmissible Pending the General Acceptance of the Technique by the Scientific Community,* 9 U.BALT.L.REV. 146 (1979); Comment, *Evidence—Voiceprint Method of Identification—Reluctance of the Courts Toward Acceptance of Scientific Evidence,* 12 N.Y.L.F. 501 (1966); Comment, *New Trends in Admissibility of Polygraph Tests and Spectrogram Voiceprint Identification Evidence,* 3 MEM.ST.U.L.REV. 282 (1973); Comment, *The Admissibility of Spectrographic Voice Identification in the State Courts,* 70 J.CRIM.L. & CRIMINOLOGY 349 (1979); Comment, *The Evidentiary Value of Spectrographic Voice Identification,* 63 J.CRIM.L., CRIMINOLOGY & POL.SCI. 343 (1972); Comment, *The Voiceprint Dilemma: Should Voices Be Seen and Not Heard?,* 35 MD. L.REV. 267 (1975); Comment, *Voice Identification Testimony Based on Spectrographic Analysis Inadmissible Because the Technique has Not Gained General Acceptance in the Scientific Community,* 39 MD.L.REV. 629 (1980); Comment, *Voiceprint Identification,* 61 GEO.L.J. 703 (1973); Comment, *Voiceprint Identification: The Trend Towards Admissibility,* 9 NEW ENG. L.REV. 419 (1974); Comment, *Voiceprints in the Courtroom—Scientific Evidentiary Problems,* 21 ARIZ.L.REV. 1163 (1979); Comment *Voiceprints—The Admissibility Question: What Evidentiary Standard Should Apply?,* 19 ST.LOUIS U.L.J. 509 (1975); Comment, *Voiceprints: The End of the Yellow Brick Road,* 8 U.S.F.L.REV. 702 (1974); Comment, *Voice Spectrogram Analysis: A Case of False Elimination,* 1980 ARIZ.ST.L.J. 217 (1980); Decker and Handler, *Voiceprint Identification—Out of the Frye Pan and Into Admissibility,* 26 AM.U.L.REV. 314 (1977); Endres, Bambach & Flosser, *Voice Spectrograms as a Function of Age, Voice Disguise, & Voice Imitation,* 49 J.ACOUST.SOC'Y AM. 1842 (1971); Gorecki, *Evidentiary Use of the Voice Spectrograph in Criminal Proceedings,* 77 MIL.L.REV. 167 (1977); Greene, *Voiceprint Identification: The Case in Favor of Admissibility,* 13 AM.CRIM.L.

The most comprehensive study of spectrography made to date, was conducted at Michigan State University by a leading expert and proponent of spectrographic analysis, Dr. Oscar Tosi. Dr. Tosi said that his study showed spectrographic analysis to be very reliable and that the result of his study showed a mean of 6.3% false identifications. Dr. Tosi believed that with certain refinements to the test that the error of false identification could be reduced to 2.4% or less. The Technical Committee On Speech Communication Of The Acoustical Society Of America requested a panel of experts consisting of Richard Bolt, Franklin Cooper, Edward David, Peter Denesi, James Pickett and Kenneth Stevens, to study the accuracy of spectrographic analysis in light of Dr. Tosi's findings. After examining this question the panel concluded "[t]he available results are inadequate to establish the reliability of voice identification by spectrograms. We believe this conclusion is shared by most scientists who are knowledgeable about speech; hence, many of them are deeply concerned about the use of spectrographic evidence in the courts." *Speaker Identification by Speech Spectrograms, A Scientist's View of Its Reliability for Legal Purposes,* 47 J.ACOUST.SOC'Y AM. 597, 603 (1970). In 1971–72, Dr. Tosi conducted further experiments in spectrographic analysis. In 1973, Bolt, Cooper, David, Denes, Pickett and Stevens again addressed the "voiceprint" issue, in light of the additional studies done by Dr. Tosi. Again, the panel determined that the reliability of spectrographic analysis was still questionable. The panel was deeply concerned by the Tosi Experiments' failure to address the problems of mimicking or disguising of voices, changes in voice levels, and changes due to stress or other emotional states of the speaker. Additional concern was expressed over the increase in error rates in comparing voice samples taken at different times, as well as the increase of error when the tests were conducted outside the pristine confines of the laboratory. The panel concluded:

[T]he Tosi study has improved our understanding of some of the problems of voice identification from spectrograms by indicating the influence of several important variables on the accuracy of identification. In uncovering factors that tend to increase identification errors, however, the study has not given us a definitive answer to the question: "How reliably can a person be identified by examining the spectrographic patterns of his speech sounds?" Under certain laboratory conditions and for some selected

REV. 171 (1975); Hazen, *Effects of Differing Phonetic Contexts on Spectrographic Speaker Identification,* 54 J.ACOUST.SOC'Y AM. 650 (1973); Hecker, Stevens, von Bismark & Williams, *Manifestations of Task–Induced Stress in the Acoustic Speech Signal,* 44 J.ACOUST. SOC'Y AM. 993 (1968); Hennessy & Romig, *Sound, Speech, Phonetics, & Voiceprint Identification,* 16 J.FORENSIC SCI. 438 (1971); Hollien, *The Peculiar Case of Voiceprints,* 56 J.ACOUST.SOC'Y AM. 210 (1974); Hollien & McGlone, *The Effect of Disguise on Voiceprint Identification,* 2 J.CRIM.DEF. 117 (1976); Jones, *Danger—Voiceprints Ahead,* 11 AM.CRIM.L. REV. 549 (1973); Jones, *Evidence vel non—the Non sense of Voiceprint Identification,* 62 KY.L. J. 301 (1974); Kamine, *The Voiceprint Technique: Its Structure & Reliability,* 6 SAN DIEGO L.REV. 213 (1969); Kersta, *Speaker Recognition and Identification by Voiceprints,* 40 CONN.B.J. 586 (1966); Kersta, *Voiceprint Identification,* 196 NATURE 1253 (1962); Manning, *Understanding Speaker Identification Techniques,* 17 TRIAL 61 (Oct.1981); Reich, Moll & Curtis, *Effects of Selected Vocal Disguises Upon Spectrographic Speaker Identification,* 60 J.ACOUST. SOC'Y AM. 919 (1976); Shaw, *Crime Counter-* *measures,* 9 PHYSICS IN TECHNOLOGY 192 (1978); Siegal, *Cross–Examination of a Voiceprint Expert: A Blueprint for Trial Lawyers,* 12 CRIM.L.BULL. 509 (1976); Stevens, Williams, Carbonell & Woods, *Speaker Authentication and Identification: A Comparison of Spectrographic and Auditory Presentations of Speech Material,* 44 J.ACOUST.SOC'Y AM. 1596 (1968); Thomas, *Voiceprint—Myth or Miracle (The Eyes Have It),* 3 U.SAN.FERN.V.L.REV. 15 (1974); Tosi, Oyer, Lashbrook, Pedrey, Nicol & Nash, *Experiment on Voice Identification,* 51 J.ACOUST.SOC'Y AM. 2030 (1972): Williams & Stevens, *Emotions and Speech: Some Acoustical Correlates,* 52 J.ACOUST.SOC'Y AM. 1238 (1972); Young & Campbell, *Effects of Context on Talker Identification,* 42 J.ACOUST.SOC'Y AM. 1250 (1967). *See also* A.B.A. Section of Criminal Justice, *Voiceprint Identification: Admissible Evidence?* (1974); Committee on Evaluation of Sound Spectrograms, National Research Council, *On The Theory and Practice of Voice Identification* (1979); A. MOENSSENS & F. INBAU, *SCIENTIFIC EVIDENCE IN CRIMINAL CASES* (2d ed. 1978).

sample of the population, the probability of making an error in identification can be stated. But for the less than ideal conditions encountered in forensic situations, the indications are that the probability of error will increase substantially. Further studies are needed, with particular attention to the examiners decision criteria, the selection of speaker population, the time lapse between voice samples, background noise conditions, and the psychological condition of the speaker.

As scientists rather than lawyers, we offer no judgment as to whether or to what extent speech spectrograms should be used for identification in courts. We wish only to point out that present methods for such use lack an adequate scientific basis for estimating reliability in many practical situations and that laboratory evaluations of these methods show increasing errors as the conditions for evaluation move toward real life situations.

Bolt, et al., *Speaker Identification By Speech Spectrograms: Some Further Observations* 54 J.ACOUST.SOC'Y AM. 531, 533–534 (1973).

In 1976, the National Academy of Sciences was requested by the Federal Bureau of Investigation to evaluate the use of sound spectrograms for identifying speakers. The National Research Council appointed a multi-disciplinary committee to investigate and evaluate spectrographic analysis. This committee consisted of scientists in the fields of acoustics, physics, speech communications, audio engineering, psychophysics, audiology and speech, and communication engineering. After exhaustive study, this committee concluded that under the current "state of the art" of spectrographic analysis techniques, the reliability of spectrograms was doubtful. Some of the concerns of the committee were the degree of variability in spectrographic depictions of the same word uttered by the same speaker, and the inherent indifference among the quality of recording equipment and the skills of spectrographic examiners in a "science" that relies

so heavily on the subjective belief of the examiner. The committee concluded:

> The engineering practice of voice identification may evolve as objective measures for assessing performance are developed empirically and as the methods or training and practice are improved.... Although beginnings in this evolution have been made and several major scientific problems have been identified, the relevant information now available does not provide an adequate basis for the committee to predict whether, and if so, when, the aural-visual process of voice identification will become a fully developed technology based solidly on science.

*Committee On Evaluation Of Sound Spectrograms, National Research Council, On The Theory And Practice of Voice Identification* (1979). As a result of the study, the Federal Bureau of Investigation does not use spectrographic experts to testify at trial.

Other studies done in this area show error rates much higher than those found in the first study conducted by Dr. Tosi. In studies conducted under conditions closely representing "real life" forensic situations error rates as high as 83% have been reported. *Thomas, Voiceprints: Myth Or Miracle In Scientific And Expert Evidence* 1046 (2nd ed. 1981). In our case, Dr. Ritterman testified that a 1979 study by Dr. Tosi showed an 84% accuracy rate. Dr. Ritterman further testified that, other than the Tosi studies, he had not seen any study in which a higher accuracy rate than 78% was achieved. He stated that in the scientific community an error rate of 5% or less is required before a scientific test is generally accepted as being accurate. The Acoustical Society of America voted, unanimously, to reject the validity of spectrographic analysis. In a report entitled *Status Report Of Voiceprint Identification In The United States*, presented to the International Conference On Crime Countermeasures, Science and Engineering, held at Oxford, England, in July 1977, the author concluded:

> To continue to use such a procedure that has been so seriously challenged— and in areas as socially sensitive as are

the courts—is, without question, inconsciencable [sic] and unethical. Hence, it is my hope that the "voiceprint" proponents will agree to defer application of their process until they can demonstrate its validity to the scientific community.

The studies and articles chronicled above sufficiently show that spectrographic analysis is not generally accepted within the relevant scientific community. Admittedly, there are eminent scholars who are proponents of sound spectrography for voice identification. But as the *Collins* court pointed out, "the proponents of sound spectrography for voice identification are distinctly in the minority, and that the remainder of the relevant scientific community has either expressed opposition or has expressed no opinion—perhaps necessarily, owing to the incomplete and preliminary nature of the work in this field." *Collins*, 405 N.Y.S.2d at 370. Because spectrographic analysis clearly has not gained general acceptance within the relevant scientific community, I would hold it inadmissible in this state. Further, even applying the more liberal test for admission advocated by Professor McCormick, I would still find this evidence to have been improperly admitted in this case. It is clear from examining all of the scientific literature in this field that the probative value of spectrographic analysis is uncertain at best and doubtful at worse. The damning nature of this evidence is readily apparent. I would find that the prejudicial effect of the evidence would clearly outweigh any probative value it might have. *Cf. Free*, 493 So.2d at 785–789.

## IS THE ERROR HARMLESS?

The test for harm is whether there is a reasonable possibility that the evidence might have contributed to the conviction or the punishment assessed. *Green v. State*, 727 S.W.2d 263, 267 (Tex.Crim.App.1987). The admission of improper evidence puts a heavy burden on the State, as the beneficiary of the error, to prove beyond a reasonable doubt, that the error did not contribute to the conviction or the punishment assessed. *Foster v. State*, 687 S.W.2d 65, 66 (Tex.App.—Dallas 1985, pet. ref'd). To determine whether the improperly admitted evidence contributed to the conviction, I ask whether the "minds of an average jury" would have found the State's case less persuasive had the testimony been excluded. *Bird v. State*, 692 S.W.2d 65, 70 (Tex.Crim.App.1985).

The question of identity was hotly contested in this case. The victim described her assailant to the police as a white male, blond, tan, 5'8' and 140 lbs. The police showed her photographic lineup consisting of six photo's including appellant. Appellant is a white male, blond, and tan. The other five persons in the photographic lineup appear to be dark haired, Mexican-American youths. Also, the background in appellants photo is different than the background of the other photos. In spite of this overtly suggestive lineup, the victim was still unable to identify her assailants. The victim was then shown a police lineup in which, again, appellant was the only white, tan and blond person present. At this lineup the victim identified the assailant. The victim testified at trial that appellant was the person who raped her. Appellant testified on his own behalf and denied committing the rape. The defense also called Craig Furche, a friend of appellant's who testified that he believed appellant rode to work with him the morning of the rape.

The State introduced a steak knife found in appellant's car which was *similar* to the one that the victim testified that the rapist took from her kitchen. It's undisputed, however, that appellant was living in his car and had many kitchen utensils in the car at the time of his arrest. It is also noteworthy that this particular type of steak knife is very common.

A pair of pants were also introduced into evidence which were taken from appellant's car and which the victim testified were worn by her assailant; however, the description of the pants given by the victim to the police, at the time of the assault, was not consistent with the type of pants recovered from appellant's car. Also, there was

a major question as to whether appellant could even fit into the pants in question.

The victim's testimony, the steak knife found in appellant's car, the pants, and the voiceprint tapes constituted the State's only evidence pertaining to identification. Under the facts and circumstances of this case I don't believe it can be said that the "minds of an average jury" would have found the State's case no less persuasive had the spectrographic evidence been excluded. This is indeed a classic case where the "scientific proof introduced may well have assumed a posture of mystic infallibility in the eyes of a jury." *Addison*, 498 F.2d at 744.

The probative value of the victim's testimony was lessened by her uncertainty in identifying appellant and the questionable identification techniques employed by the police. Appellant's testimony directly contradicted the victims' testimony. The appellant also had an alibi witness testify in his behalf. The probative value of the steak knife is diminished by the circumstances surrounding its discovery and the commonness of the knife.

In light of the above, the "voiceprint" evidence cannot be considered harmless. It is, in fact, extremely damaging. The State was allowed to introduce expert testimony that stated, in effect, that scientific tests were conducted which proved that appellant was the rapist. It cannot be said from the state of the record that this testimony did not make the testimony been excluded. Consequently, I cannot agree with the majority's characterization of this error as harmless.

### CONCLUSION

I would hold that expert testimony, based on spectrographic analysis, is not admissible in this State. Further, I vehemently disagree with the holding of the majority that this error is harmless. Therefore, I would reverse and remand for a new trial.